**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ZERO EMISSION TRANSPORTATION ASSOCIATION, | |
| *Petitioner*, | |
| v. | No. 25-1167 |
| NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION; PETER SIMSHAUSER, in his official capacity as Chief Counsel and Acting Administrator of the National Highway Traffic Safety Administration; and SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, | |
| *Respondents*. | |

**PETITION FOR REVIEW**

Pursuant to 5 U.S.C. § 702, 49 U.S.C. § 32909, Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Rule 15, the Zero Emission Transportation Association (ZETA) hereby petitions this Court to review the final rule of the National Highway Traffic Safety Administration (NHTSA) entitled *Resetting the Corporate Average Fuel Economy Program*, published at 90 Fed. Reg. 24,518 (June 11, 2025) (Ex. A).

This petition is timely filed not later than fifty-nine (59) days after the regulation was prescribed. *See* 49 U.S.C. § 32909. Venue is proper in this Court pursuant to 49 U.S.C. § 32909, both because this Court is a proper venue for petitions for review of NHTSA regulations carrying out 49 U.S.C. §§ 32901-32904 or 32908, and because ZETA has its principal place of business in the District of Columbia. *Id.* § 32909. ZETA is "adversely affected" by the rule within the meaning of 49 U.S.C. § 32909.

Among other things, the rule introduces a new interpretation of NHTSA's statutory authority to set fuel economy standards for new passenger vehicles and light-duty trucks (known as "Corporate Average Fuel Economy" or "CAFE" standards) and to set fuel-efficiency standards and compliance and enforcement protocols for new commercial medium- and heavy-duty (MDHD) on-highway vehicles and work trucks. In the rule, NHTSA also announces that it "will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in th[e] rule." 90 Fed. Reg. at 24,526.

Citing the rule, NHTSA has also refused to issue notifications to manufacturers regarding their compliance with applicable federal fuel efficiency standards. *See id.*; Letter from Peter Simshauser, Chief Counsel for NHTSA, to manufacturers (July 11, 2025) (Ex. B) (explaining that NHTSA will not issue compliance notifications for model year 2022 and onward while it reconsiders current fuel efficiency standards). Because it has not yet issued compliance notifications, NHTSA likewise cannot transfer credits earned by vehicle manufacturers for exceeding applicable fuel efficiency standards to other vehicle manufacturers who have already contracted to purchase those credits to meet their own compliance obligations. *See generally* 49 C.F.R. §§ 536.5(d), 536.8(a), (d) (NHTSA will not honor credit transfers until the corresponding credits are added to the manufacturer's account).

NHTSA's refusal to issue compliance notifications is especially harmful because of prior delays in processing compliance reports. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984). For light-duty vehicles, NHTSA has not processed end-of-year reports and issued compliance notifications for model year 2022 onward. For medium-duty pickups and vans, the new delay is even more damaging: NHTSA has not processed end-of-year reports or issued compliance notifications for any model year dating back to model year 2018.

ZETA seeks review of the rule on the grounds that it is contrary to the Energy Policy and Conservation Act of 1975 (EPCA), Pub. L. No. 94-163, 89 Stat. 871, the Energy Independence and Security Act of 2007 (EISA), Pub. L. No. 110-140, 121 Stat. 1492, and other applicable law. In addition, the rule's promulgation violates the Administrative Procedure Act (APA) because it is arbitrary, capricious, an abuse of discretion, and/or otherwise contrary to law; contrary to constitutional right or power; in excess of statutory jurisdiction, authority, or limitations; and promulgated without observance of procedure required by law, 5 U.S.C. § 701 *et seq.*

ZETA respectfully requests that the Court hold the rule unlawful, vacate it, and remand the matter to NHTSA for further proceedings. Moreover, the Court should order NHTSA to issue compliance notifications to manufacturers for all model years up to model year 2024 and should retain jurisdiction to ensure compliance. *See* 5 U.S.C. § 706(1) (court may "compel agency action unlawfully withheld or unreasonably delayed"); 28 U.S.C. § 1651(a).

Dated: August 6, 2025                                     Respectfully submitted,

                                                          */s/ Meghan E. Greenfield*
                                                          Meghan E. Greenfield
                                                          Elizabeth H. Starr
                                                          Jenner & Block LLP
                                                          1099 New York Ave., NW Suite 900
                                                          Washington, DC 20001
                                                          (202) 637-6000
                                                          mgreenfield@jenner.com

                                                          *Counsel for Petitioner*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ZERO EMISSION TRANSPORTATION ASSOCIATION,<br><br>*Petitioner*,<br><br>v.<br><br>NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION; PETER SIMSHAUSER, in his official capacity as Chief Counsel and Acting Administrator of the National Highway Traffic Safety Administration; and SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation,<br><br>*Respondents*. | No. 25-1167 |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Zero Emission Transportation Association (ZETA) submits the following disclosure statement.

ZETA is an association of over three dozen companies committed to advocating for the advancement of the electric vehicle supply chain (*see* membership list here: https://www.zeta.org/about (last visited Aug. 5, 2025)). Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, ZETA states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. ZETA has no parent corporation, and no publicly held company has 10% or greater ownership in ZETA. ZETA is a "trade association" within the meaning of Circuit Rule 26.1.

4

Dated: August 6, 2025

Respectfully submitted,

_/s/ Meghan E. Greenfield_
Meghan E. Greenfield
Elizabeth H. Starr
Jenner & Block LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
(202) 637-6000
mgreenfield@jenner.com

_Counsel for Petitioner_

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2025, I caused a true and correct copy of this Petition for Review to be served via first class U.S. mail, postage prepaid, by placing a copy in a properly addressed envelope in a U.S. mail receptacle at 353 N. Clark Street, Chicago, IL to the party listed below:

> Sean Duffy
> Secretary of Transportation
> U.S. Department of Transportation
> 1200 New Jersey Avenue SE
> Washington, DC 20590

> /s/ *Meghan E. Greenfield*
> Meghan E. Greenfield
> Jenner & Block LLP
> 1099 New York Ave., NW Suite 900
> Washington, DC 20001
> (202) 637-6000
> mgreenfield@jenner.com

Exhibit A

USCA Case #25-1167     Document #2129100     Filed: 08/06/2025     Page 8 of 28

cause for making this technical correction final without prior proposal and opportunity for comment because such notice and opportunity for comment is unnecessary as the technical correction is for minor typographical, non-substantive errors only.

*Correction*

## PART 1090 [CORRECTED]

In FR Doc. 2024–31218 appearing at 90 FR 4320 in the **Federal Register** of Wednesday, January 15, 2025, the following correction is made:

### § 1090.1355 [Corrected]

■ 1. On page 4361, in the third column, in § 1090.1355, in Equation 1 to paragraph (a), "RVP = 0.946 . $P_{total}$ − 0.347" is corrected to read: "RVP = 0.956 • $P_{total}$ − 0.347".

**Abigale Tardif,**

*Principal Deputy Assistant Administrator, Office of Air and Radiation.*

[FR Doc. 2025–10528 Filed 6–10–25; 8:45 am]

**BILLING CODE 6560–50–P**

---

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

**[MB Docket No. 25–108; RM–11998; DA 25–373; FR ID 293660]**

### Television Broadcasting Services; Hazard, Kentucky; Correction

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule; correction.

**SUMMARY:** The Federal Communications Commission published a document in the **Federal Register** of May 5, 2025, concerning a rulemaking filed by Gray Television Licensee, LLC, licensee of WYMT–TV, Hazard, Kentucky, requesting substitution of channel 12 for channel 20 at Hazard in the Table of TV Allotments. The document contained the incorrect state in the title.

**DATES:** June 11, 2025.

**FOR FURTHER INFORMATION CONTACT:** Emily Harrison, Media Bureau, at *Emily.Harrison@fcc.gov,* (202) 418–1665, or Mark Colombo, Media Bureau, at Mark. *Colombo@fcc.gov,* (202) 418–7611.

**SUPPLEMENTARY INFORMATION:**

*Correction*

In rule FR Doc. 2025–07755, in the **Federal Register** of May 5, 2025, on page 18928, in the first column, correct the title caption to read:

### Television Broadcasting Services; Hazard, Kentucky;

Dated: May 5, 2025.
Federal Communications Commission.

**Thomas Horan,**

*Chief of Staff, Media Bureau.*

[FR Doc. 2025–10604 Filed 6–10–25; 8:45 am]

**BILLING CODE 6712–01–P**

---

## DEPARTMENT OF TRANSPORTATION

### National Highway Traffic Safety Administration

### 49 CFR Parts 531, 533, and 535

**[Docket No. NHTSA–2025–0055]**

### Resetting the Corporate Average Fuel Economy Program

**AGENCY:** National Highway Traffic Safety Administration (NHTSA), Department of Transportation (DOT).

**ACTION:** Interpretive rule.

**SUMMARY:** The National Highway Traffic Safety Administration is issuing this interpretive rule to set forth the agency's interpretation of the factors the agency is prohibited by law from considering when setting maximum feasible fuel economy standards under the Energy Policy and Conservation Act of 1975, the Energy Independence and Security Act of 2007, and other applicable law. This rule describes NHTSA's interpretation of its authority to establish the necessary legal foundation for bringing the Corporate Average Fuel Economy (CAFE) program into compliance with relevant statutory requirements. The rule also describes NHTSA's interpretation of its authority for a commercial medium- and heavy-duty (MDHD) on-highway vehicle and work truck fuel efficiency improvement program, also establishing the necessary legal foundation for bringing that program into compliance with the law. Pending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in this rule.

**DATES:** This interpretive rule is applicable as of June 11, 2025.

**FOR FURTHER INFORMATION CONTACT:** For technical and policy issues, Joseph Bayer, CAFE Program Division Chief, Office of Rulemaking, National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590; email: *joseph.bayer@dot.gov;* phone: (202) 366–1810. For legal issues,

Hannah Fish, NHTSA Office of the Chief Counsel, National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590; email: *hannah.fish@dot.gov.*

**SUPPLEMENTARY INFORMATION:** The National Highway Traffic Safety Administration (NHTSA) is issuing this interpretation as the foundation for resetting its Corporate Average Fuel Economy (CAFE)[1] and medium- and heavy-duty fuel efficiency (MDHD) programs as authorized by law. In accordance with the President's Executive Order, *Unleashing American Energy,* and the Secretary's Memorandum, *Fixing the CAFE Program,* NHTSA is in the process of reviewing and reconsidering fuel economy standards applicable to vehicles produced from model year (MY) 2022 forward.[2] NHTSA is also reviewing the existing MDHD standards, including those standards for heavy-duty pickup trucks and vans referenced in the Secretary's Memorandum. NHTSA will apply this interpretation to ensure any changes to these standards and standards set in the future comply with the law, including the legal prohibition on considering dedicated alternative and dual-fueled vehicles and credit trading when setting CAFE standards.[3]

### I. Background

The Energy Policy and Conservation Act of 1975 (EPCA), as amended by the Energy Independence and Security Act of 2007 (EISA), directs the Secretary of Transportation—and NHTSA by delegation—to prescribe average fuel economy standards for the United States passenger automobile and non-passenger automobile fleets, separately, for each model year at the maximum feasible average fuel economy level.[4] Passenger automobiles are those that the Secretary decides by regulation are manufactured primarily for transporting not more than ten individuals, but do not include automobiles that the Secretary decides by regulation have a significant feature designed for off-highway operation and are 4-wheel

---

[1] NHTSA's light-duty program for automobiles. *See, e.g.,* 49 U.S.C. 32902(b)(1)(A)–(B).

[2] *Unleashing American Energy,* Executive Order 14154 of January 20, 2025, 90 FR 8353 (Jan. 29, 2025); Memorandum from the Secretary of Transportation to Office of the Administrator of the National Highway Traffic Safety Administration (NHTSA), Office of the Assistant Secretary for Policy (OST–P) and Office of the General Counsel (OGC) (Jan. 28, 2025), *available at https:// www.transportation.gov/sites/dot.gov/files/2025-01/ Signed%20Secretarial%20Memo%20re%20 Fixing%20the%20CAFE%20Program.pdf.*

[3] *See* 49 U.S.C. 32902(h).

[4] 49 U.S.C. 32902(b)(2)(B); 49 CFR 1.95.

drive automobiles or are rated at more than 6,000 pounds gross vehicle weight.[5] Non-passenger automobiles are defined as not passenger automobiles or work trucks.[6] Thus, by elimination, non-passenger automobiles are, in general, those that are not primarily for transporting individuals and those that have significant features designed for off-highway operation. Non-passenger automobiles are also referred to as light trucks.

NHTSA also is required to prescribe fuel economy standards for "work trucks and commercial medium-duty or heavy-duty on-highway vehicles."[7] NHTSA is required to "determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement."[8]

When deciding what levels of fuel economy are "maximum feasible," the statute states that NHTSA "shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy."[9] When carrying out its statutory directive to set fuel economy standards at the maximum feasible level, NHTSA must not consider the fuel economy of dedicated automobiles; must consider dual-fueled automobiles to be operated only on gasoline or diesel fuel; and must not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.[10] A dedicated automobile is one "that operates only on alternative fuel," which includes, among others, fuels such as methanol, hydrogen, electricity, or "any other fuel the Secretary of Transportation prescribes by regulation that is not substantially petroleum and that would yield substantial energy security and environmental benefits."[11] Non-exhaustive examples of dedicated automobiles include electric vehicles (EVs) when powered solely by electricity, natural gas vehicles (NGVs), and other similar vehicles including fuel-cell electric vehicles (FCEVs) powered by hydrogen or dedicated propane vehicles. A dual-fueled automobile is, among other requirements, "capable of operating on

alternative fuel . . . and on gasoline or diesel fuel,"[12] and includes plug-in hybrid electric vehicles (PHEVs) that can be powered in a "gasoline only" mode (charge-sustaining mode) or with a mix of electricity and gasoline (charge-depleting mode), or "flex-fuel vehicles" (FFVs) that can operate on gasoline or a high-ethanol blend.

Finally, 49 U.S.C. 32902(h) prohibits NHTSA from considering the trading, transferring, or availability of credits under section 32903. The credits in section 32903 are those that manufacturers earn when their CAFE compliance value exceeds their CAFE standard.[13] Manufacturers can apply these "overcompliance" credits up to three years before and five years after the model year in which the credits are earned;[14] they can transfer these credits between their own passenger and non-passenger automobile fleets,[15] subject to statutory restrictions;[16] and trade these credits to other manufacturers under a program established by NHTSA pursuant to discretionary statutory authority, again subject to certain statutory restrictions.[17]

These three limitations—referred to herein as section 32902(h) limitations or factors for their location in the United States Code at 49 U.S.C. 32902(h)—are the primary focus of this interpretive rule. In this interpretive rule, NHTSA affirms that the agency cannot consider the section 32902(h) factors for any purpose and at any point in the process of setting fuel economy standards. NHTSA also examines other aspects of the agency's CAFE and MDHD programs to ensure that both programs are compliant with the law.

*a. Congress Prohibited NHTSA's Consideration of the Section 32902(h) Factors in Standard-Setting*

EPCA was passed in the context of the Arab oil embargoes of the 1970s when American consumers and the U.S. economy were threatened by gasoline shortages and high fuel prices. The House report accompanying the legislation noted that, as a result, the legislation sought to address the national security dangers of America's dependence on foreign oil.[18] Consistent

with that context, the House report stated that the purpose of the CAFE program was to induce automakers into offering America's consumers more fuel-efficient vehicle options to advance the national goal of conserving energy while simultaneously "recogniz[ing] that the automobile industry has a central role in our national economy and that any regulatory program must be carefully drafted so as to require of the industry what is attainable without either imposing impossible burdens on it or unduly limiting consumer choice as to capacity and performance of motor vehicles."[19]

As originally enacted, EPCA did not limit the Secretary's consideration of factors when setting maximum feasible standards. Limitations in section 32902(h) first appeared in the Alternative Motor Fuels Act of 1988 (AMFA).[20] AMFA aimed to displace energy derived from imported oil to help achieve energy security and improve air quality by encouraging the development of widespread use of methanol, ethanol, and natural gas as transportation fuels by consumers and the production of methanol, ethanol, and natural gas-powered motor vehicles. The statute specified that, in carrying out responsibilities to set maximum feasible fuel economy standards, "the Secretary shall not consider the fuel economy of alcohol powered automobiles or natural gas powered automobiles, and the Secretary shall consider dual energy automobiles and natural gas dual energy automobiles to be operated exclusively on gasoline or diesel fuel."[21] One member of Congress described AMFA's approach as "evenhanded" in that the bill did not favor one alternative fuel over another; rather, "it allow[ed] the market to pick the non-petroleum alternative fuel of the future."[22]

The conferees specifically noted their intent to ensure that the Secretary of Transportation did not erase the AMFA

---

[5] 49 U.S.C. 32901(a)(18).
[6] 49 U.S.C. 32901(a)(17).
[7] 49 U.S.C. 32902(b)(1)(C).
[8] 49 U.S.C. 32902(k)(2).
[9] 49 U.S.C. 32902(f).
[10] 49 U.S.C. 32902(h).
[11] 49 U.S.C. 32901(a)(1).

[12] 49 U.S.C. 32901(a)(9).
[13] 49 U.S.C. 32903.
[14] 49 U.S.C. 32903(a).
[15] 49 U.S.C. 32903(g).
[16] 49 U.S.C. 32903(g)(3), (4).
[17] 49 U.S.C. 32903(f).
[18] *See, e.g.,* H.R. Rep. No. 94–340, at 6–10, 87–88 (1975) (available in the docket for this action) ("In 1973 the embargo affected 14 percent of U.S. petroleum consumption and precipitated a $10- to $20-billion drop in GNP. . . . In June of 1973 the average selling price for regular gasoline was

reported to be approximately 38.8 cents per gallon, including tax. By June of 1974 that price had increased to 55.1 cents per gallon, an addition in excess of 42 percent. Yet in the same period, gasoline demand went from 6.8 million barrels per day to 7.0 million barrels per day. In other words, gasoline demand actually increased by 2.9 percent even though prices had jumped by over 42 percent. . . . Part B of title V of the bill establishes a long range program for improving automobile fuel economy by requiring manufacturers and importers to meet increasingly stringent average fuel economy standards, and to disclose the fuel economy of each new automobile sold in the United States.").

[19] *Id.* at 87.
[20] Alternative Motor Fuels Act of 1988, Public Law 100–494 (1988).
[21] *Id.* at 102 STAT. 2450.
[22] 134 Cong. Rec. H25122 (Sept. 23, 1988) (statement of Rep. Sharp).

incentives by setting the CAFE standards for passenger or non-passenger automobiles "at a level that assumes a certain penetration of alternative fueled vehicles." [23] Specifically, "i[t] is intended that [NHTSA's maximum feasibility] examination will be conducted without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet, in order to ensure that manufacturers taking advantage of the incentives offered by this bill do not then find DOT including those incentive increases in the manufacturer's 'maximum fuel economy capability.'" [24]

The Energy Policy Act of 1992 expanded the section 32902(h) limitations to include all dedicated alternative-fueled vehicles. [25] The Energy Policy Act's accompanying House report acknowledged that the widespread use of alternative fuels faced several problems, but expanded the AMFA requirements to keep the program "fuel neutral." [26] This was because "all the data, experience, and knowledge gathered concerning alternative fuels over the past two decades points to the fact that no one fuel is 'the winner.'" [27]

There have been no subsequent substantive changes to the language in 49 U.S.C. 32902(h), [28] including with the enactment of EISA in 2007. The statutory prohibition was clear at the time of enactment and has remained clear: it is impermissible for NHTSA to consider the fuel economy of dedicated automobiles in setting maximum feasible fuel economy standards.

### b. Statutory Requirement for MDHD Standards

NHTSA is required to also prescribe average fuel economy standards for work trucks and commercial medium-duty or heavy-duty on-highway vehicles in accordance with 49 U.S.C. 32902(k). [29] In subsection (k), the statute specifically requires NHTSA "to determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement," and to "adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible." [30] NHTSA's civil penalty authorities for violations of the agency's fuel economy standards also do not include a civil penalty for violations of the MDHD standards. [31]

### c. Presidential Executive Orders and the Secretary of Transportation's Memorandum on Fixing the CAFE Program

On January 20, 2025, the President issued several Executive Orders, with two in particular pertaining to NHTSA's fuel economy program and directly relevant to this action. Executive Order 14148, *Initial Rescission of Harmful Executive Orders and Actions,* revoked various Executive orders issued by the previous administration, including several that directed NHTSA to reconsider the fuel economy standards finalized in 2020. [32] Executive Order 14154, *Unleashing American Energy,* announced the Administration's policy regarding energy resources, specifically to promote the production, distribution, and use of reliable domestic energy supplies, including oil, natural gas, and biofuels; to ensure that all regulatory requirements related to energy are "grounded in clearly applicable law;" and "to eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice." [33] The Order directed that the United States do this by "removing regulatory barriers to motor vehicle access; by ensuring a level regulatory playing field for consumer choice in vehicles; by terminating, where appropriate, state emissions waivers that function to limit sales of gasoline-powered automobiles; and by considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies and effectively mandate their purchase by individuals, private businesses, and government entities alike by rendering other types of vehicles unaffordable." [34]

On January 28, 2025, the Secretary of Transportation issued a memorandum, titled *Fixing the CAFE Program,* stating that there is "strong reason to conclude that the [2022 and 2024 final rule] CAFE standards promulgated by NHTSA are contrary to Administration policy as reflected in President Trump's Executive Orders and are inconsistent with the substantive statutory requirements applicable to the CAFE program enacted by Congress and codified in chapter 329 of title 49, United States Code." [35] The memorandum directed NHTSA, accordingly, to "commence an immediate review and reconsideration of all existing fuel economy standards applicable to all models of motor vehicles produced from model year 2022 forward, including in particular the rules titled *Corporate Average Fuel Economy Standards for Model Years 2024–2026 Passenger Cars and Light Trucks* (87 FR 25710) and *Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for*

---

[23] *Id.* at 25124 (statement of Rep. Dingell).

[24] *Id.*

[25] Energy Policy Act of 1992, Public Law 102–486 (1992) ("Title V of the Motor Vehicle Information and Cost Savings Act (15 U.S.C. 2001 *et seq.*) is amended . . . in section 502(e)—(A) by striking "alcohol powered automobiles or natural gas powered" and inserting in lieu thereof "dedicated").

[26] H.R. Rep. No. 102–474, at 35 (1992).

[27] *Id.*

[28] In 1994, Congress restated the laws related to transportation in one comprehensive title in the recodification of title 49 of the United States Code, *see* S. Rep. No. 103–265 (1994); H.R. Rep. No. 103–180 (1993). The recodification, which was enacted to restate without substantive change all transportation laws in one title, substituted simple language for "awkward and obsolete terms," and eliminated superseded, executed, and obsolete laws. The standard changes made uniformly throughout the revised section are explained in a report preceding the law. Important for this interpretation, "the words 'may not' are used in a prohibitory sense, as 'is not authorized to' and 'is not permitted to.'"

[29] Public Law 110–140 (2007), 121 Stat. 1499 (codified at 49 U.S.C. 32902(b)(1)(C)].

[30] 49 U.S.C. 32902(k)(2).

[31] The Energy Independence and Security Act of 2007 (EISA), Public Law 110–140 (2007), 121 Stat. 1499, amended the civil penalty provision of NHTSA's fuel economy statute to add a provision addressing the use of civil penalties for research and development, but it did not include a civil penalty for MDHD standards. *See* 121 Stat. 1508 (codified at 49 U.S.C. 32912(e)). EISA also included a civil penalty for violations of a tire fuel efficiency information program. *Id.* at 1507.

[32] 90 FR 8237 (Jan. 28, 2025). Among others, Executive Order 14148 rescinded Executive Order 14008 of January 27, 2021 (*Tackling the Climate Crisis at Home and Abroad*) (instituting a whole-of-government effort to reduce carbon dioxide emissions); Executive Order 14037 of August 5, 2021 (*Strengthening American Leadership in Clean Cars and Trucks*) ("setting a goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles" and directing the Secretary of Transportation to set fuel economy standards accordingly); Executive Order 14057 of December 8, 2021 (*Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability*) (promoting government procurement of electric vehicles); Executive Order 14082 of September 12, 2022 (*Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022*) (applying incentives for production and sale of electric vehicles); Executive Order 14094 of April 6, 2023 (*Modernizing Regulatory Review*) (directing use of modified cost-benefit analysis that inflates the estimated long-term benefits of carbon-reduction regulations, such as higher CAFE standards).

[33] 90 FR 8353 (Jan. 29, 2025).

[34] *Id.*

[35] Memorandum from the Secretary of Transportation to Office of the Administrator of the National Highway Traffic Safety Administration (NHTSA), Office of the Assistant Secretary for Policy (OST–P) and Office of the General Counsel (OGC) (Jan. 28, 2025), available at *https://www.transportation.gov/sites/dot.gov/files/2025-01/Signed%20Secretarial%20Memo%20re%20Fixing%20the%20CAFE%20Program.pdf.*

Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond (89 FR 52540)." [36] Furthermore, the Secretary directed NHTSA, at the earliest opportunity, to "propose the rescission or replacement of any fuel economy standards as determined necessary to bring the CAFE program into compliance with Administration policy and the requirements of the law." [37]

After the President and Secretary's initial direction on reconsidering the CAFE program, the President issued Executive Order 14219, *Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative.*[38] That Executive Order directed agencies, among other things, to identify regulations that are "based on anything other than the best reading of the underlying statutory authority or prohibition" and work with White House offices and personnel to rescind or modify these regulations, as appropriate.[39] That Order also directed agencies, when proposing new regulations, to take account of specific factors related to law or Administration policy laid out in the order,[40] such as whether the regulation is based on the best reading of the underlying statutory authority or prohibition.

In accordance with direction from the President and the Secretary of Transportation, and pursuant to NHTSA's authority under Chapter 329 of Title 49, the agency is issuing this interpretive rule to affirm that the agency cannot consider the section 32902(h) factors for any purpose and at any point in the process of setting fuel economy standards. Not only does the plain text of the statute make clear that NHTSA's prior consideration of the section 32902(h) limitations was inconsistent with the substantive statutory requirements applicable to the CAFE program, but the legislative history affirms this interpretation as well. In this interpretative rule, NHTSA also addresses the statutory provisions applicable to the MDHD program, including the absence of a civil penalty for violations of standards established under that program. This interpretation provides the foundation for subsequent fuel economy standards rulemakings to reset the CAFE program to implement the President and Secretary's directives on CAFE, to reset the MDHD program,

and to ensure that future regulatory actions are consistent with the agency's underlying statutory authority and specific prohibitions in the law.

## II. Interpretation of Statutory Limitations in 49 U.S.C. 32902(h) as Applied to NHTSA's Standard-Setting Analysis

Since the beginning of the CAFE program in the late 1970s, NHTSA has evaluated vehicle manufacturers' ability to comply with different levels of CAFE standards by, among other things, performing an analysis that evaluates a cost-effective pathway for manufacturers to apply fuel-economy-improving technologies to their vehicles.[41] More recently, NHTSA has used the CAFE Compliance and Effects Model (commonly referred to as "the CAFE Model") to perform this analysis. NHTSA uses the model as a tool to estimate how manufacturers could attempt to comply with a given CAFE standard by adding technology to anticipated vehicle fleets and to estimate the impacts of additional technology application. NHTSA also uses the model to evaluate the sensitivity of these estimated outcomes to key analytical inputs (*e.g.,* fuel prices), and to perform probabilistic uncertainty analysis. While the analytical results are used to inform the maximum feasible determination,[42] the analytical results do not *dictate* the maximum feasible determination.[43] It is ultimately up to the agency to balance the available information regarding technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on

fuel economy, and the need of the United States to conserve energy— whether from the technical and economic analysis or other legally appropriate considerations—to set maximum feasible CAFE standards.

In the 2012, 2020, 2022, and 2024 final rules, NHTSA took the position that it could account for the factors prohibited from consideration in section 32902(h) by using a narrow construction of that provision. This narrow interpretation permitted dedicated alternative and dual-fueled vehicles to be added to an existing reference fleet of vehicles [44] in response to reasons other than NHTSA's CAFE standards,[45] and outside of the years for which NHTSA was setting standards.[46] NHTSA prohibited the consideration of dedicated or dual-fueled vehicles only as a compliance option in response to the agency's fuel economy standards during "standard-setting" years (*i.e.,* the model years being evaluated as the subject of the active rulemaking), and similarly prohibited consideration of manufacturers' use of compliance credits only during the standard-setting years. In other words, the model did not apply dedicated or dual-fueled technology to a manufacturer's fleet of vehicles when simulating a cost-effective pathway for the manufacturer to comply with a given level of CAFE standards only in standard-setting years, but application of the technology was otherwise permitted.

---

[36] *Id.*

[37] *Id.*

[38] 90 FR 10583 (Feb. 25, 2025).

[39] *Id.* at Sec. 2(iii) and 2(d).

[40] *Id.* at Sec 4.

[41] *See, e.g.,* Rulemaking Support Paper Concerning the 1981–1984 Passenger Auto Average Fuel Economy Standards (July 1977).

[42] *See, e.g., Pub. Citizen v. Nat'l Highway Traffic Safety Admin.,* 848 F.2d 256 (D.C. Cir. 1988).

[43] *See, e.g.,* 85 FR 24174, at 24227 (April 30, 2020) ("As explained elsewhere in this document and as made repeatedly clear over the past several rulemakings, the CAFE model (or, for that matter, any model) neither sets standards nor dictates where and how to set standards; it simply informs as to the potential effects of setting different levels of standards."); 89 FR 52540, at 52855 (June 24, 2024) ("We underscore again that the modeling analysis does not dictate the "answer," it is merely one source of information among others that aids NHTSA's balancing of the standards."). As an example, a non-exhaustive list of modeled estimated impacts of manufacturers adding fuel-economy-improving technology to vehicles could include technology penetration rates, per-vehicle increases in technology costs, fuel savings to the consumer, or total fuel savings by the entire fleet manufactured in a given model year. It is then up to NHTSA to balance these results within the framework of the 49 U.S.C. 32902(f) factors, *e.g.,* total fleetwide fuel savings and per-vehicle increases might be two relevant metrics to explore across alternatives as NHTSA considers how heavily to weigh "the need of the United States to conserve energy" against "economic practicability."

[44] NHTSA's "reference fleet" is a snapshot of an existing U.S. vehicle fleet in a particular model year. NHTSA uses its CAFE compliance data and publicly available manufacturer materials to capture vehicle technologies that already exist in the fleet as a starting point from which to measure further potential technology application.

[45] In accordance with Executive Order 12866 of September 30, 1993 (58 FR 51735) and OMB Circular A–4 (September 17, 2003), to evaluate properly the benefits and costs of regulations and their alternatives, agencies must identify a "no action" baseline: what the world will be like if the proposed rule is not adopted.

[46] Based on the nature of NHTSA's analysis and CAFE rulemaking cycles, NHTSA's reference fleet often precedes the first year for which the agency is setting standards by a handful of years. As an example, in the 2020 final rule, NHTSA used a MY 2017 reference fleet for a standard-setting analysis that covered MYs 2021–2026; similarly, in the 2024 final rule, NHTSA used a MY 2022 reference fleet for a standard-setting analysis that covered MYs 2027–2031. This means that the CAFE Model must "walk up" the reference fleet in years prior to the standard-setting years to the latest year prior to the first standard-setting year; continuing the example from above, in the 2020 final rule the CAFE Model added technology to the MY 2017 fleet from MYs 2018–2020, prior to the first year of standard-setting, which was MY 2021. In addition, NHTSA's analysis also considers explicitly years beyond standard-setting years, because the effects of a fleet of vehicles subject to a particular year's CAFE standards will have effects over the full useful lives of those vehicles.

However, NHTSA's prior consideration of the factors prohibited in section 32902(h)—even if in response to reasons other than NHTSA's standards and even if in non-standard-setting years—is inconsistent with a plain reading of section 32902(h) and with the most faithful approach to standard-setting in furtherance of the design and purposes of EPCA.

*a. Improper Consideration of Dedicated Alternative Vehicle Fuel Economy*

The text of the statute is unequivocal: section 32902(h) prohibits the Secretary from considering the fuel economy of "dedicated vehicles." Specifically, subsection (h)(1) states that the Secretary "may not consider the fuel economy of dedicated automobiles." This does not mean that NHTSA may consider the fuel economy of dedicated automobiles in certain circumstances or during certain timeframes of the agency's choosing or provided that certain criteria specified by the agency are met. Rather, the prohibition means that NHTSA may not consider the fuel economy of dedicated vehicles in any respect and at any point in the process of setting fuel economy standards. Yet that is precisely what the agency did in promulgating the previous standards.

In prior rules, NHTSA exercised certain analytical options that prevented the CAFE Model from applying dedicated alternative fueled vehicle technologies in standard-setting years beyond those already in the reference fleet. However, NHTSA did not restrict dedicated alternative fueled vehicle application in the model years either before or after the standard-setting years. NHTSA also modeled that manufacturers would apply dedicated alternative fueled vehicle technology in the absence of CAFE standards if that technology recouped fuel savings for the consumer within 30 months.

In the two most recent prior rulemakings, NHTSA also included dedicated alternative fueled vehicle technologies in the analysis by accounting for three policies that would be expected to result in significant continued electrification of the fleet. Specifically, NHTSA accounted for Zero Emission Vehicle (ZEV) mandates applicable in California and the other states that have adopted them;[47] some vehicle manufacturers' voluntary commitments to the state of California to continued annual nationwide reductions of vehicle greenhouse gas

emissions through model year (MY) 2026, with greater rates of electrification than would have been expected under NHTSA's 2020 final rule; and manufacturers' joint responses to previously promulgated fuel economy and greenhouse gas emissions standards, which included dedicated electric vehicles. These decisions meant that NHTSA assumed significant numbers of EVs would continue to be produced regardless of the standards set by the agency, in turn increasing the level of standards that could be considered maximum feasible.

The prior consideration of dedicated vehicles' fuel economy in the agency's analysis sets the floor for what was deemed feasible and therefore made improvements beyond what is achievable by an internal combustion engine fleet seem attainable. The inclusion of EVs inherently impacts the agency's determination of maximum feasible standards because EVs are generally imputed to have significantly higher fuel economy than vehicles with an internal combustion engine.[48] Likely, NHTSA would not have proposed or adopted standards as stringent as the previous standards if NHTSA had not considered the fuel economy of EVs in its modeling analysis. NHTSA reasoned that this was appropriate because "accounting for technology improvements that manufacturers would make even in the absence of CAFE standards allows NHTSA to gain a more accurate understanding of the effects of the final rule."[49] However, the inclusion of dedicated vehicles in NHTSA's previous analysis impacted materially the standards that ultimately were promulgated.

This situation is precisely what the drafters of AMFA were protecting against when imposing limitations on the Secretary's consideration of certain factors when setting maximum feasible standards. As one member of Congress stated specifically: "i[t] is intended that [NHTSA's maximum feasibility] examination will be conducted without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet, in order to ensure that manufacturers taking advantage of the incentives offered by this bill do not then find DOT including those incentive

increases in the manufacturer's 'maximum fuel economy capability.' "[50]

*b. Improper Consideration of Dual-Fueled Vehicle Fuel Economy*

Section 32902(h)(2) requires NHTSA to consider "dual fueled automobiles to be operated only on gasoline or diesel fuel." Accordingly, NHTSA must consider PHEVs' fuel economy only when running on gasoline or diesel fuel, *i.e.,* in charge-sustaining mode, not their fuel economy when also running on electricity, *i.e.,* charge-depleting mode. Yet NHTSA expressly considered the fuel economy of PHEVs factoring in their operation using electricity in previous rulemakings, failing to comply faithfully with section 39202(h)(2)'s prohibition.

NHTSA's application of dual-fueled vehicle technology has evolved continuously over successive standard-setting analyses but failed to adhere to the section 32902(h) prohibition each time. In the 2012 final rule, NHTSA interpreted section 32905 ("Manufacturing incentives for alternative fuel vehicles") to authorize consideration of PHEVs' electric fuel economy post-model year 2019,[51] reasoning that the expiration of the statutory credit in 2019 would somehow render section 32902(h)(2)'s prohibition "moot." [52] NHTSA believed that "[i]t would be an unreasonable result if the phase-out of the credit meant that manufacturers would be effectively penalized, in CAFE compliance, for building dual-fueled automobiles like plug-in hybrid electric vehicles, which may be important 'bridge' vehicles in helping consumers move toward full electric vehicles." [53]

NHTSA's reasoning does not explain how the expiration of a statutory incentive would allow the agency to consider the PHEV's electric fuel economy in formulating CAFE standards after model year 2019 when the statute expressly prohibits NHTSA from considering PHEV electric fuel economy in formulating CAFE standards, without caveat or exception. In addition, section 32902(h)(2) has never been repealed, and repeals by

---

[47] 42 U.S.C. 7507. Other states have adopted California's ZEV program requirements under Section 177 of the Clean Air Act (so-called "Section 177 states").

[48] Fuel economy for EVs is determined using a petroleum equivalency factor (PEF) set by the Department of Energy. For example, one EV manufacturer had a fuel economy performance of 739.9 and 751.9 miles per gallon for its MY 2020 domestic passenger and light truck fleets as compared to the 43.4 and 30.2 miles per gallon overall performance of the same fleets for all manufacturers.

[49] 89 FR 52540, at 52611 (June 24, 2024).

[50] 134 Cong. Rec. H25124 (Sept. 23, 1988) (statement of Rep. Dingell).

[51] *See* 49 U.S.C. 32905(b), (f); 77 FR 62624, at 63127–28. That provision created "[m]anufacturing incentives for alternative fuel automobiles" manufactured from MYs 1993 to 2019 by directing the Environmental Protection Agency (EPA) to use a formula that enhanced the fuel economy of dual-fueled vehicles above what they could obtain on gasoline for the limited purpose of calculating compliance with fuel economy standards.

[52] 77 FR 62624, at 63020 (Oct. 15, 2012).

[53] *Id.*

implication are not favored.[54] Moreover, despite several cross-references to other provisions, section 32902(h)(2) does not mention or cross-reference the manufacturing incentives in section 32905 of the statute, nor does it reference credits at all. Congress knows precisely how to sunset provisions and must do so expressly.[55] Indeed, Congress has included express sunset provisions in other sections of the fuel economy statute (sections 32905(b) and 32906(a)), and there is no sunset provision in Section 32902(h)(2). As a result, section 32902(h)(2)'s prohibition on considering the electric fuel economy of PHEVs remains in force. Unlike other subsections of section 32902, which specify the application of certain provisions to certain model years, section 32902(h) does not have limited applicability.[56]

NHTSA carried its interpretation through the 2020 and 2022 final rule analyses but has since reconsidered this issue and determined that doing so was based on an erroneous reading of the statute, separate from the 2012 rule logic relating to how to give effect to both section 32902(h) and section 32905.[57][58] The agency now explicitly repudiates both prior approaches.

Most recently, the 2024 final rule analysis considered PHEV fuel economy only when operated in charge sustaining mode during standard-setting years but considered PHEV fuel economy when operating in charge depleting mode in the years before and after the standards.[59] In addition, NHTSA allowed PHEV technology application

for the same reasons as the dedicated alternative fueled vehicle technology application, *i.e.,* outside of the standard-setting years or for reasons other than in direct response to NHTSA's CAFE standards, including for the same reasons that the model could apply dedicated alternative fueled vehicle technology, discussed above. This consideration also goes too far. The statutory text of section 32902(h)(2), which states that NHTSA "shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel" does not mean that NHTSA may consider dual-fueled automobiles to be operated by electricity or other fuel in certain circumstances or during certain timeframes of the agency's choosing, or provided that certain criteria specified by the agency are met. The prohibition means that NHTSA may not consider the fuel economy of dual-fueled automobiles operated by electricity or other fuel in any respect and at any point in the process of setting fuel economy standards. NHTSA's decisions to do otherwise increased the level of average fuel economy standards for each fleet in the baseline, making higher standards appear more feasible.

### c. Improper Consideration of Compliance Credits

NHTSA cannot consider compliance credits that manufacturers earn by exceeding the CAFE standards and then use to achieve compliance in years in which their measured average fuel economy falls below the standards. Section 32902(h)(3) provides that the agency "may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903." However, the agency expressly considered compliance credits in setting the previous standards.[60]

NHTSA estimated the state of vehicle manufacturers' credit banks prior to the standard-setting years, simulating the use of credits as a means of compliance with previously promulgated standards.[61] The CAFE Model included a setting to establish a "last year to

consider credits," set at the last year prior to the standard-setting years. NHTSA explained that this allowed the model to "replicate the practical application of existing credits toward compliance in the early years but also to examine the impact of proposed standards based solely on fuel economy improvements in all years for which new standards are being considered."[62] This consideration, however, allowed NHTSA to underestimate manufacturer costs to comply with standards by assuming that manufacturers could use credit application as a means of baseline compliance, rather than by paying civil penalties or by applying additional fuel-economy-improving technology.

NHTSA has taken the position in the past that section 32902(h)(3) extends only to "model years for which the agency is establishing maximum feasible standards" in a particular rulemaking.[63] Upon further consideration, however, NHTSA concludes that that interpretation does not reflect the most faithful application of the statute, which prohibits the agency's taking into account compliance credits in setting fuel economy standards.[64] The statute does not grant NHTSA discretion to consider compliance credits in any manner—as with the section 32902(h)(1) and section 32902(h)(2) criteria discussed above, section 32902(h)(3) does not allow NHTSA to consider credit trading in certain circumstances or during certain timeframes of the agency's choosing, or provided that certain criteria specified by the agency are met. The prohibition means that NHTSA may not consider credit trading in any respect and at any point in the process of setting fuel economy standards.[65] By creating an exception where the statute does not provide one, the agency deviated from the requirements of section 32902(h)(3).[66]

Congress's grant of authority to NHTSA to set maximum feasible fuel economy standards specifies that the fuel economy standards established by the agency must be feasible and practicable for gas-powered vehicles without regard to any reliance on non-gas-powered alternatives or compliance credits. Automakers remain, of course, free to produce dedicated and dual

---

[54] *Posadas* v. *Nat'l City Bank of N.Y.,* 296 U.S. 497, 503 (1936).

[55] *See HollyFrontier Cheyenne Refin., LLC* v. *Renewable Fuels Ass'n,* 141 S. Ct. 2172, 2180 (2021).

[56] *See* 49 U.S.C. 32902(b)(2).

[57] Specifically, in the 2020 and 2022 final rules, the agency failed to account for Congress's 2014 amendment that provided a method for calculating the fuel economy of electric dual-fueled automobiles manufactured after model year 2015, by carrying forward the 2012 final rule reasoning without change. Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, Public Law 113–291, § 318, 128 Stat. 3292, 3341–3342 (2014).

[58] USCA Case #22–1080, Document #1991134, at 91 (filed March 21, 2023).

[59] *See, e.g.,* 89 FR 52540, at 52634–35 (June 24, 2024) ("Unlike with other technologies in the analysis, including other electrification technologies, Congress placed specific limitations on how we consider the fuel economy of alternative fueled vehicles (such as PHEVs, [battery electric vehicles (BEVs)], and [fuel cell electric vehicles FCEVs]) when setting CAFE standards. We implement these restrictions in the CAFE Model by using fuel economy values that assume "charge sustaining" (gasoline-only) PHEV operation, and by restricting technologies that convert a vehicle to a BEV or a FCEV from being applied during "standard-setting" years.").

[60] *See* 87 FR 25710, at 25747, 25778–79 (May 2, 2022); 89 FR 52540, at 52598 (June 24, 2024).

[61] *See, e.g.,* 85 FR 24174, at 24309 (April 30, 2020). Note that the CAFE Model has never simulated the ability to trade credits between manufacturers but can simulate the strategic accumulation and application of compliance credits, as well as the ability to transfer credits between fleets to improve the compliance position of a less efficient fleet by leveraging credits earned by a more efficient fleet. The model prefers to hold on to earned compliance credits within a given fleet, carrying them forward into the future to offset potential future deficits. This assumption is consistent with observed strategic manufacturer behavior dating back to 2009.

[62] *See, e.g., id.* at 24307.

[63] 85 FR 25710, at 25778 (May 2, 2022).

[64] *See* American Heritage Dictionary 313 (2d ed. 1985) (defining "consider" to mean "take into account").

[65] *Cf. United States* v. *Palomar-Santiago,* 593 U.S. 321, 325–26 (2021); *Ass'n of Civilian Technicians* v. *FLRA,* 22 F.3d 1150, 1153 (D.C. Cir. 1994).

[66] *See Lomax* v. *Ortiz-Marquez,* 140 S. Ct. 1721, 1725 (2020).

alternative fueled vehicles like electric vehicles and plug-in hybrid electric vehicles in response to market demand. However, as the statute and legislative history make clear, NHTSA cannot, in any respect and at any point in the process, consider these elements when setting fuel economy standards.

## III. CAFE Program Regulations Based on the Best Reading of the Underlying Statute Would Minimize Market Distortion

Consistent with the President's directive to identify classes of regulations that are based on anything other than the best reading of the underlying statutory authority or prohibition,[67] and pursuant to NHTSA's own statutory and delegated authority, the agency will consider in the upcoming rulemaking various CAFE program provisions to ensure that its interpretation of the statute results in regulations that are consistent with the statutory text. In particular, the agency has identified CAFE program regulations not explicitly required by EPCA and EISA that run counter to the purpose and intent of both statutes, and that have likely induced reactions in the market that impact producers and consumers without effectuating Congress' intent to insulate the U.S. from major disruptions in the global oil market. These reactions include major non-market-based changes in automobile designs and the introduction of fundamental alterations in their production processes not primarily driven by market demand.

As one example, NHTSA's prior interpretation of the section 32902(h) factors in standard-setting has had secondary effects that the agency intends to address in its subsequent standard-setting rulemaking. NHTSA has determined that credit trading between manufacturers has become necessary in recent years due to standards that are unattainable by manufacturers with diversified powertrain technologies. By creating standards that are feasible without considering dedicated or dual fueled vehicle technologies or the use of compliance credits, distortions are minimized. The availability of credits is uncertain, and eliminating reliance on credit trading as a compliance option would help verify that the standards established by NHTSA are achievable by manufacturers. Thus, the agency is considering whether credit trading

between manufacturers, as authorized but not required by 49 U.S.C. 32903(f), should be retained. The agency does not intend to impact automakers' ability to transfer earned credits between different categories of vehicles in their fleets, including between their passenger car and non-passenger car fleets, as prescribed by statute.

As another example, NHTSA will examine in its future rulemaking how its regulations at 49 CFR 523.5, *Non-passenger automobile,* effectuate the definitions in 49 U.S.C. 32901. Importantly, NHTSA will investigate and seek comment on how its regulatory definitions may have caused, if any, shifts in the type and characteristics of vehicles offered in the market that otherwise may not have occurred. In the 2010 and 2012 final rules, NHTSA reconsidered its vehicle classification regulations but ultimately concluded to monitor and revisit them in future rulemakings. Notably, NHTSA stated that "no one can predict with certainty how the market will change between now and 2025" specifically regarding how vehicle manufacturers may "make more deliberate redesign efforts to move vehicles out of the car fleet and into the truck fleet in order to obtain the lower target."[68] As it is now 2025, NHTSA plans to update agency analysis using actual data. As both the agency and stakeholders have previously noted (as in the 2012 final rule for example), revisiting the vehicle classification regulations would likely need to be accompanied by changes to the shapes of the footprint curves or the stringency of the standards to ensure the standards still reflect maximum feasibility for the adjusted fleets.[69] To the extent that such changes in the aggregate effectuate the best reading of the statute and prevent unnecessary market distortion, NHTSA believes that investigating its vehicle classification regulations is a necessary undertaking. NHTSA will examine the data it now has in considering any reconsideration.

NHTSA will consider whether to reconsider or repeal any other market-distorting incentives it identifies in the standard-setting rulemaking following this interpretive rule. Specifically, NHTSA will evaluate applicable

technology-specific incentives and analyze their impacts for the future rulemaking.

## IV. Interpretation of Statutory Authority and Requirements Applicable to the MDHD Program

Section 32902(b)(1)(C) requires NHTSA to prescribe "average fuel economy standards for . . . work trucks and commercial medium-duty and heavy-duty on-highway vehicles in accordance with subsection (k)," and subsection (k) requires a "fuel efficiency improvement program designed to achieve the maximum feasible improvement."[70] Section 32902(f) sets forth the specific parameters that NHTSA is to consider in establishing "maximum feasible" standards or improvements: "[w]hen deciding maximum feasible average fuel economy under this section, the Secretary of Transportation shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." Despite this statutory enunciation of the specific factors NHTSA is to consider in rulemaking involving a determination of "maximum feasible" fuel economy, NHTSA did not apply the section 32902(f) factors when setting MDHD standards.[71] This failure to apply expressly applicable statutory criteria merits reconsideration of the MDHD standards.

In addition, in establishing the MDHD program in 2011, NHTSA created a non-statutory civil penalty scheme that it lacked the statutory authority to promulgate.[72] NHTSA asserted that the ability to set "compliance and enforcement protocols" provided in subsection (k) enabled it to establish,

---

[67] Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative, Executive Order 14219 of Feb. 19, 2025, 90 FR 10583 (Feb. 25, 2025).

[68] 77 FR 62624, at 63122.

[69] *Id.* at 63123 ("One important point to note in the comparative analysis in the MYs 2012–2016 rulemaking is that, due to time constraints, the agency did not attempt to refit the respective fleet target curves or to change the intended required stringency in MY 2016 of 34.1 mpg for the combined fleets. If we had refitted curves, considering the vehicles in question, we might have obtained a somewhat steeper passenger car curve, and a somewhat flatter light truck curve, which could have affected the agency's findings.").

[70] 49 U.S.C. 32902(b)(1)(C), (k).

[71] 76 FR 57112 (Sept. 15, 2011) ("Congress emphasized that the test methods, measurement metrics, standards, and compliance and enforcement protocols must all be appropriate, cost-effective, and technologically feasible for commercial medium-duty and heavy-duty on-highway vehicles and work trucks. NHTSA notes that these criteria are different from the 'four factors' of 49 U.S.C. 32902(f) that have long governed NHTSA's setting of fuel economy standards for passenger cars and light trucks, although many of the same issues are considered under each of these provisions.") (footnote omitted). NHTSA does not explain in the 2011 rule why the requirement for standards that are "appropriate, cost-effective, and technologically feasible" and "designed to achieve the maximum feasible improvement" in subsection (k) means that NHTSA can disregard the requirement in subsection (f) that NHTSA must consider the four enumerated factors in developing standards.

[72] *See* 76 FR 57106 (Sept. 15, 2011) (adopting civil penalty of up to $37,500 per vehicle or engine in 49 CFR 535.9).

through regulation, a civil penalty of its choosing.[73] NHTSA did not argue that the civil penalties in 49 U.S.C. 32912 apply,[74] and NHTSA continues to believe that section 32912 does not provide authority for civil penalties for work trucks and commercial medium-duty or heavy-duty on-highway vehicles subject to MDHD standards.

Section 32912 establishes civil penalties both for violations of CAFE standards and for other violations of 49 U.S.C. chapter 329.[75] The general penalty in 49 U.S.C. 32912(a) of up to $10,000 per violation expressly excludes violations of standards prescribed under section 32902.[76] The civil penalty for violations of standards prescribed under section 32902 is set forth in section 32912(b). While both CAFE and MDHD fuel economy standards are prescribed under section 32902,[77] the civil penalty applicable to violations of CAFE standards does not apply to MDHD standards because it is calculated by reference to "automobiles."[78] "Automobiles" are vehicles subject to CAFE standards, and are distinct from "work trucks and commercial medium-duty or heavy-duty on highway vehicles" subject to MDHD standards.[79] Thus, the only civil penalties established in chapter 329 plainly do not apply to violations of MDHD standards.

In the absence of an applicable statutory civil penalty, NHTSA adopted a civil penalty equal to that in the Clean Air Act, a statute that does not confer authority on NHTSA and that it does not administer.[80] NHTSA reasoned it could "fill gaps" left by Congress and

that Congress intended a penalty despite not actually adopting one in the statute.[81] As noted above, however, Congress did amend the civil penalty provision of the fuel economy statute at the same time as it required NHTSA to set MDHD standards and adopted penalties for other violations of law, but Congress did not adopt a penalty for violations of MDHD standards.[82] NHTSA has reconsidered this issue and determined that because NHTSA has not been statutorily authorized to impose civil penalties for violations of MDHD standards, NHTSA's civil penalty scheme adopted by regulation—currently up to $51,668 per vehicle or engine—is unauthorized.[83]

NHTSA also established a credit program for the MDHD program that allows for transfers and trading. Contrasted with the detailed statutory provision that enables manufacturers to earn credits in the CAFE program, permits NHTSA to establish a credit trading program, and constrains the use of credits, the statute does not even mention credits in the rulemaking mandate for the MDHD program from which NHTSA claimed vast discretion, but instead contains only an ambiguous reference to "compliance and enforcement protocols."[84] NHTSA has reconsidered its authority to establish credit trading for the MDHD program and determined that Congress knew how to authorize NHTSA to establish a credit trading program and provide specific direction to NHTSA regarding how to establish a credit trading program, and did not do so in authorizing NHTSA to establish "compliance and enforcement protocols."

NHTSA also considered credits and EVs, resulting in more stringent MDHD standards, without express authority to do so and in contrast with the explicit limitations applicable to the CAFE program in section 32902(h) on these issues.[85]

NHTSA will engage in rulemaking to reconsider the standards established for the MDHD program and other aspects of the program consistent with the

interpretations set forth in this interpretive rule.

## V. Next Steps in Resetting the CAFE Program and Enforcement Considerations

All Americans are harmed by CAFE-imposed price increases, but those most harmed are lower-income Americans who cannot afford to buy an EV or to pay more for a gas-powered vehicle. As the Secretary stated, "[a]rtificially high fuel economy standards designed to meet non-statutory policy goals, such as those NHTSA has promulgated in recent years, impose large costs that render many new vehicle models unaffordable for the average American family and small business owner."[86] The Secretary explained that these regulatory costs, market distortions from technology-specific incentives, and pressures on automakers result in more Americans driving older used vehicles, "which statistics show are much less safe in a highway crash. Thus, there is reason to be concerned these standards will actually increase the number of fatalities and serious injuries occurring each year on America's roadways—an unacceptable outcome that is contrary to NHTSA's mission of advancing highway traffic safety for all Americans."[87]

With respect to the MDHD program, which is explicitly for commercial vehicles, a reset is also necessary to ensure appropriate regulation consistent with law. Reevaluation of this program is necessary to ensure that the agency's MDHD program is lawful and does not result in market distortions. Commercial purchasers are well aware of their own fuel economy needs. Their purchases of MDHD vehicles are informed business decisions that occur in a highly competitive and self-regulating market. Government intervention in excess of statutory requirements and authority interferes with the efficient functioning of this market.

NHTSA believes that the interpretation set forth in this rule appropriately clarifies the scope of its authority related to setting maximum feasible CAFE standards and with respect to the MDHD program. This interpretation does not, itself, change existing CAFE or MDHD standards or any rights or obligations under the CAFE or MDHD programs. Instead, this interpretation lays the appropriate groundwork for standard-setting rulemakings that will reset the agency's regulatory programs as determined necessary to bring them into compliance

---

[73] *See id.* at 57132–33 ("NHTSA continues to believe that it is reasonable to interpret 'compliance and enforcement protocols' to include authority to impose civil penalties . . . . NHTSA believes that if Congress had intended for a predetermined penalty scheme to apply to the new HD program, it would have been specific.").

[74] *See id.* at 57133 ("NHTSA believes that Section 32912 does not apply to the new HD program . . . .").

[75] 49 U.S.C. 32912(a)–(b).

[76] *See id.* at 32912(a) ("A person that violates section 32911(a) of this title is liable to the United States Government for a civil penalty of not more than $10,000 for each violation."); 32911(a) ("A person commits a violation if the person fails to comply with this chapter and regulations and standards prescribed and orders issued under this chapter (except sections 32902, 32903, 32908(b), 32917(b), and 32918 and regulations and standards prescribed and orders issued under those sections).").

[77] *Id.* at 32902(b).

[78] *Id.* 32912(b).

[79] *Compare id.* 32901(a)(3) (defining "automobile"), *with* (a)(7), (19) (defining "commercial medium- and heavy-duty on-highway vehicle" and "work truck"); *see also id.* 32912(b) (requirements to set CAFE standards and MDHD standards).

[80] 76 FR 56132–33 (Sept. 15, 2011).

[81] *See id.*

[82] *See* 121 Stat. 1508–08 (adopting civil penalty of up to $50,000 per violation for tire fuel efficiency information program and adding provision addressing use of civil penalties for research and development to 49 U.S.C. 32912).

[83] *See* 49 CFR 535.9(b); 578.6(i).

[84] *Compare* 49 U.S.C. 32903 *with* 49 U.S.C. 32902(k)(2).

[85] *See* 76 FR 57129 (Sept. 15, 2011). While the limitations on considering credits and EVs in 49 U.S.C. 32902(h) do not apply to the MDHD program, the broad authority claimed by the agency raises legal concerns that merit reconsideration in future rulemaking.

[86] Fixing the CAFE Program Secretarial Memorandum, at 2–3.

[87] *Id.* at 3.

with Administration policy and applicable substantive statutory requirements as enacted by Congress and codified in chapter 329 of title 49 of the United States Code.

In light of the legal interpretation set forth in this interpretive rule, NHTSA will reset the CAFE and MDHD standards programs consistent with the law. Pending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in this rule.

## Regulatory Analyses

NHTSA has examined this interpretive rule in accordance with the requirements of Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improving Regulation and Regulatory Review; Executive Order 14192, Unleashing Prosperity Through Deregulation; Executive Order 14219, Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative; Executive Order 13132, Federalism; Executive Order 12988, Civil Justice Reform; Executive Order 13175, Consultation and Coordination with Indian Tribal Governments; the Unfunded Mandates Reform Act of 1995; the Regulatory Flexibility Act of 1980; the Paperwork Reduction Act; the National Environmental Policy Act of 1969; statutes relevant to privacy issues, and the Congressional Review Act.

NHTSA is issuing this interpretive rule to explain the statute the agency administers and how the agency will apply its interpretation to subsequent substantive CAFE and MDHD program rules. This interpretive rule does not amend or alter the meaning of any regulations, and any costs and benefits of any subsequent proposed changes to regulations will be analyzed in forthcoming rules to reset the CAFE and MDHD programs. As such, notice and comment under the Administrative Procedure Act is not required for this interpretive rule, see 5 U.S.C. 553(b)(A), and the rule similarly is not subject to a 30-day delay in effective date, see 5 U.S.C. 553(d)(2).

*A. Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improving Regulation and Regulatory Review; Executive Order 14192, Unleashing Prosperity Through Deregulation; and Executive Order 14219, Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative*

Executive Order (E.O.) 12866, "Regulatory Planning and Review" (58 FR 51735, Oct. 4, 1993), reaffirmed by E.O. 13563, "Improving Regulation and Regulatory Review" (76 FR 3821, Jan. 21, 2011), provides for determining whether a regulatory action is "significant" and therefore subject to the Office of Management and Budget (OMB) review process and to the requirements of the E.O. This is a "significant regulatory action" under section 3(f)(4) of E.O. 12866. Accordingly, NHTSA submitted this action to OMB for review. However, there are no costs or benefits associated with this interpretive rule. Any costs and benefits of the forthcoming rules implementing the interpretation and resetting the CAFE and MDHD programs will be analyzed in those subsequent rulemakings.

E.O. 14192, "Unleashing Prosperity Through Deregulation" (90 FR 9065, Feb. 6, 2025) requires an agency, unless prohibited by law, to identify at least ten existing regulations to be repealed when the agency publicly proposes for notice and comment or otherwise promulgates a new regulation. In furtherance of this requirement, section 3(c) of Executive Order 14192 requires that the new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least ten prior regulations. As discussed above, there are no costs or benefits associated with this interpretive rule. However, this interpretive rule, which sets forth NHTSA's interpretation of its statutory authority for the issuance of CAFE and MDHD standards, ensures that, going forward, NHTSA will no longer regulate beyond its statutory authority with respect to the CAFE and MDHD programs. Any costs and benefits of the forthcoming rules implementing the interpretation and resetting the CAFE and MDHD programs will be analyzed in those rulemakings. The subsequent substantive CAFE and MDHD rules could be deregulatory actions that result in significant cost savings.

E.O. 14219, Ensuring Lawful Governance and Implementing the President's "Department of Government

Efficiency" Deregulatory Initiative requires agency heads to review their regulations and identify regulations that, among other things, are based on anything other than the best reading of the underlying statutory authority or prohibition, or that implicate matters of social, political, or economic significance that are not authorized by clear statutory authority. As described above, NHTSA has identified its CAFE and MDHD standards as falling within an enumerated category(ies) of E.O. 14219. NHTSA is issuing this interpretive rule to set forth the agency's interpretation of the factors the agency is prohibited by law from considering when setting maximum feasible fuel economy standards. This rule describes NHTSA's interpretation of its authority to establish the necessary legal foundation for bringing the CAFE and MDHD programs into compliance with relevant statutory requirements.

*B. Executive Order 13132, Federalism*

A rule has implications for federalism under section 1(a) of E.O. 13132 if it has "substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." NHTSA has determined that this interpretive rule will not have substantial direct costs on or for States, nor would it limit the policymaking discretion of States. Nothing in this document preempts any State law or regulation. Therefore, this interpretive rule does not have sufficient federalism implications to warrant the preparation of a Federalism Impact Statement.

*C. Executive Order 12988, Civil Justice Reform*

E.O. 12988, "Civil Justice Reform" (61 FR 4729, Feb. 7, 1996), requires that agencies promulgating new regulations or reviewing existing regulations take steps to minimize litigation, eliminate ambiguity, and to reduce burdens on the regulated public. NHTSA has reviewed this rule and determined that this action conforms to the applicable standards in sections 3(a) and 3(b)(2) of E.O. 12988, Civil Justice Reform.

*D. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

This interpretive rule does not have Tribal implications under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal

Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

### E. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) requires Federal agencies to assess the effects of their discretionary regulatory actions. UMRA addresses actions that may result in the expenditure by a State, local, or Tribal government, in the aggregate, or by the private sector of $206 million (which is the value equivalent of $100 million in 1995, adjusted for inflation to 2024) or more in any 1 year. As discussed above, this interpretive rule by itself results in no expenditures and therefore the analytical requirements of UMRA do not apply. Any costs and benefits will be analyzed in forthcoming rules resetting the CAFE and MDHD programs subject to the principles laid out in this document.

### F. Regulatory Flexibility Act of 1980

The Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.,* requires agencies to prepare a regulatory flexibility analysis for any rule where the agency is required by law to publish a general notice of proposed rulemaking. *See* 5 U.S.C. 603. NHTSA is not required to complete a regulatory flexibility analysis because, as discussed above, this action is not subject to notice and public comment under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(A).

### G. Paperwork Reduction Act

This interpretive rule contains no new information collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

### H. National Environmental Policy Act of 1969

In accordance with 42 U.S.C. 4336, "[a]n agency is not required to prepare an environmental document with respect to a proposed agency action if the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5 [of the United States Code]. As discussed above, this action is not a final agency action within the meaning of 5 U.S.C. chapter 5. Any environmental effects will be analyzed in forthcoming rules resetting the CAFE and MDHD programs subject to the principles laid out in this document.

### I. Privacy

The Consolidated Appropriations Act, 2005 (Pub. L. 108–447, 118 Stat. 2809, 3268, Dec. 8, 2004 (5 U.S.C. 552a note)), requires certain parties (Federal agencies and any non-Federal entity that receives records contained in a system of records from a Federal agency for use in a matching program) to conduct a privacy impact assessment of a regulation that will affect the privacy of individuals. Because this interpretive rule does not require the collection of personally identifiable information, NHTSA is not required to conduct a privacy impact assessment.

The E-Government Act of 2002 (Pub. L. 107–347, sec. 208, 116 Stat. 2899, 2921, Dec. 17, 2002), requires Federal agencies to conduct a privacy impact assessment for new or substantially changed technology that collects, maintains, or disseminates information in an identifiable form. No new or substantially changed technology will collect, maintain, or disseminate information as a result of this interpretive rule. Accordingly, NHTSA has not conducted a privacy impact assessment.

### J. Congressional Review Act

Pursuant to the Congressional Review Act (CRA) (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as not a "major rule," as defined by 5 U.S.C. 804(2). NHTSA will submit this rule to Congress and the Government Accountability Office as required by the CRA.

Issued in Washington, DC, under authority delegated in 49 CFR 1.95, 501.4, and 501.5.

**Peter Simshauser,**
*Chief Counsel.*

[FR Doc. 2025–10586 Filed 6–10–25; 8:45 am]

**BILLING CODE 4910–59–P**

---

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 622

**[Docket No. 250606–0095]**

**RIN 0648–BN31**

### Snapper-Grouper Fishery of the South Atlantic; Amendment 59

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS issues regulations to implement Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic (Snapper-Grouper FMP) (Amendment 59). For South Atlantic red snapper, this final rule revises the commercial and recreational annual catch limits (ACLs). Amendment 59 also revises the fishing mortality (F) at maximum sustainable yield (MSY) proxy for determining overfishing, overfishing limit (OFL), acceptable biological catch (ABC), and total ACL and sector ACLs for red snapper. For the 2025 fishing year, this final rule also announces the red snapper commercial and recreational fishing season dates in the South Atlantic. For red snapper, this final rule is intended to end and prevent overfishing and revise the catch limits consistent with the most recent stock assessment.

**DATES:** This final rule is effective July 11, 2025. The 2025 red snapper commercial season opens at 12:01 a.m., local time, July 14, 2025, until 12:01 a.m., local time, January 1, 2026, unless changed by subsequent notification in the **Federal Register**. The 2025 red snapper recreational season opens at 12:01 a.m., local time, on July 11, 2025, and closes at 12:01 a.m., local time, on July 13, 2025.

**ADDRESSES:** Electronic copies of Amendment 59, which includes an environmental assessment (EA), regulatory impact review, a regulatory flexibility analysis (RFA), and the Small Entity Compliance Guide, may be obtained from the Southeast Regional Office website at *https:// www.fisheries.noaa.gov/action/ secretarial-amendment-fishery-management-plan-snapper-grouper-fishery-south-atlantic-region.*

The unique identification number for the Amendment 59 environmental review is: EAXX–006–48–1SE–1746577008EISX.

**FOR FURTHER INFORMATION CONTACT:** Rick DeVictor, telephone: 727–824–5305, or email: *rick.devictor@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** NMFS, with the advice from and the South Atlantic Fishery Management Council (Council), manages the South Atlantic snapper-grouper fishery, which includes red snapper, in the South Atlantic exclusive economic zone (EEZ) under the Snapper-Grouper FMP. The Snapper-Grouper FMP was prepared by the Council, approved by the Secretary of Commerce (Secretary), and is implemented by NMFS through regulations at 50 CFR part 622 under the authority of the Magnuson-Stevens

# Exhibit B

U.S. Department of Transportation
**National Highway Traffic Safety
Administration**



July 11, 2025

Dear manufacturers:

On July 4, 2025, the One Big Beautiful Bill Act changed the civil penalty for manufacturers that do not comply with corporate average fuel economy (CAFE) standards to $0.00 for "all model years of a manufacturer for which the Secretary of Transportation has not provided a notification pursuant to section 32903(b)(2)(B) of title 49, United States Code, specifying the penalty due for the average fuel economy of that manufacturer being less than the applicable standard prescribed under section 32902 of that title." Pub. L. 119-21, Sec. 40006. NHTSA has provided such compliance notifications through Model Year 2021. Therefore, the new penalty rate of $0.00 is applicable for Model Years 2022 and later.

In accordance with direction from the President and the Secretary of Transportation, NHTSA is reconsidering CAFE standards applicable to Model Years 2022 and later. *See* NHTSA's interpretive rule on *Resetting the Corporate Average Fuel Economy Program* 90 FED. REG. 24,518 (June 11, 2025). This ongoing reconsideration is necessary to ensure that the CAFE standards are consistent with law, including the prohibition on considering electric vehicles when setting standards. NHTSA anticipates issuing compliance notifications for Model Year 2022 after completion of its reconsideration.

We hope this letter helps clarify the impact of the change in law. Should you have any further questions, please do not hesitate to reach out.

Sincerely,

*Peter Simshauser*

Peter Simshauser
Chief Counsel

# Exhibit C

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ZERO EMISSION TRANSPORTATION ASSOCIATION,<br><br>                                   *Petitioner*,<br><br>      v.<br><br>NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION; PETER SIMSHAUSER, in his official capacity as Chief Counsel and Acting Administrator of the National Highway Traffic Safety Administration; and SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation,<br><br>                                   *Respondents*. | No. _____ |

**DECLARATION OF CHRISTOPHER NEVERS**

I, Christopher Nevers, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information, and belief:

1.      I am the Senior Director of Public Policy at Rivian Automotive, LLC (Rivian).  In that role, I oversee Rivian's regulatory compliance credit trading, including trading for light-duty vehicles under the Corporate Average Fuel Economy (CAFE) program and for medium- and heavy-duty (MDHD) vehicle fuel efficiency standards.

2.      Rivian is a member of the Zero Emission Transportation Association (ZETA).

3.      Founded in 2009, Rivian is an independent U.S. company headquartered in California. With over 14,000 employees across the globe, Rivian's mission is to Keep the World Adventurous Forever. Rivian's focus is the design, development, manufacture, sale, and distribution of all-electric adventure vehicles, specifically pickups, sport utility vehicles (SUVs), and commercial vans.

4.    Rivian brought the first modern electric pickup to market in 2021 when it launched the R1T, followed shortly thereafter by the R1S and the all-electric commercial van for Amazon, all of which are built at Rivian's manufacturing facility in Normal, Illinois. The R1T and R1S—both medium-duty passenger vehicles—provide all-electric options in segments where added utility is a necessity. The R1T and R1S both have EPA estimated ranges exceeding 400 miles. The R1T also features 11,000 pounds of towing capacity, while the R1S is a seven-passenger full-sized SUV. Both are well-equipped for off-roading in a variety of climates. Separately, our Class 2b commercial vans eliminate tailpipe emissions from last-mile delivery. Rivian is committed to producing 100,000 vans for our launch customer, Amazon, which currently operates over 20,000 electric Rivian-produced vans across the United States.

5.    The National Highway Traffic Safety Administration (NHTSA) sets fuel efficiency standards for light-duty vehicles under the Corporate Average Fuel Economy (CAFE) program. It also sets fuel efficiency standards for medium- and heavy-duty (MDHD) vehicles.

6.    Rivian manufactures and sells electric vehicles that are subject to those NHTSA fuel efficiency standards.

7.    In each model year, Rivian earns tradeable compliance credits when the average fuel economy of its fleet exceeds the applicable fuel economy standard. Rivian then enters contracts to sell those credits to other vehicle manufacturers to support their compliance with the standards.

8.    This process involves NHTSA processing end-of-year compliance reports for each manufacturer that is subject to the standards, informing them how far they exceed (and thus earn credits) or fall short of (and thus must purchase credits or pay the penalty) the model year's standards.

2

9.      NHTSA recently issued an interpretive rule setting forth a new interpretation of its authority to set vehicle fuel economy standards under both the CAFE and MDHD programs. *See Resetting the Corporate Average Fuel Economy Program*, 90 Fed. Reg. 24,518 (June 11, 2025) (Ex. A).

10.     Citing the rule, NHTSA has since refused to process end-of-year compliance reports for federal fuel efficiency standards and to issue compliance notifications to manufacturers. In a July 11 letter to vehicle manufacturers, NHTSA indicated that it would stop processing end-of-year reports and issuing compliance notifications until it completes reconsideration of the CAFE standards applicable to Model Years 2022 and later. *See* Letter from Peter Simshauser, Chief Counsel for NHTSA, to manufacturers (July 11, 2025) (Ex. B).

11.     On information and belief, NHTSA has not processed end-of-year reports or issued compliance notifications for model year 2022 and onward for light-duty vehicles, and for model year 2018 and onward for medium-duty pickups and vans.

12.     Rivian suffers harm from NHTSA's delay in processing compliance reports and issuing compliance notifications, in reliance on the rule. Until compliance notifications are processed, Rivian cannot trade credits with contracted partners and finalize transactions for credits that it has sold to traditional manufacturers in years past.

13.     Non-enforcement also decreases the cost of compliance for companies choosing to not comply with NHTSA standards, thereby harming Rivian by increasing the price for its vehicles on a relative basis, as Rivian has and will comply with NHTSA CAFE standards.

14.     NHTSA's delay means that Rivian cannot finalize already-negotiated transactions valued at over $100,000,000 in contracted credit revenue for out-performing the standards in model years 2022 through 2024.

3

15.     Rivian contacted NHTSA several times including in May and June 2025, urging it to process these reports and issue compliance notifications, to no avail.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on August 6, 2025.

Respectfully submitted,

_____
Christopher Nevers

4

# Exhibit D

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| ZERO EMISSION TRANSPORTATION ASSOCIATION, | |
| *Petitioner*, | No. _____ |
| v. | |
| NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, *et al.*, | |
| *Respondents*. | |

**DECLARATION OF ASHLEE RAMANATHAN**

I, Ashlee Ramanathan, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information, and belief:

1.      I am the Associate Director for Strategy and Business Development at Lucid USA, Inc. (Lucid). In that role, I am responsible for managing all emissions credits trading by Lucid.

2.      Lucid is a member of the Zero Emission Transportation Association (ZETA).

3.      Founded in 2016, Lucid is a publicly traded U.S. corporation headquartered in Newark, California. Lucid has approximately 6,800 employees around the world as of the end of 2024. Lucid designs, engineers, and manufactures vehicle technology across an array of facilities throughout the United States, including at our state-of-the-art Advanced Manufacturing Plant (AMP-1) in Casa Grande, Arizona—the first purpose-built EV manufacturing facility in North America.

4.      Lucid produces the Lucid Air sedan and Lucid Gravity SUV and is developing a Mid-size Platform. The Lucid Air Pure is the most energy-efficient EV on the market, and the Lucid Air Grand Touring is the longest-range EV ever rated by the EPA. Lucid's newest model, the Lucid Gravity Grand Touring SUV, brings that same innovation to the SUV segment, offering

450 miles of EPA estimated range with room for seven full-size adults and their luggage. Development is also well underway for Lucid's next-generation Mid-size Platform, which will enable more mass-market vehicle models for a broader set of customers while preserving the company's hallmark focus on performance, range, and technology.

5.      The National Highway Traffic Safety Administration (NHTSA) sets fuel efficiency standards for light-duty vehicles under the Corporate Average Fuel Economy (CAFE) program.

6.      Lucid manufactures and sells electric vehicles that are subject to NHTSA's CAFE standards.

7.      In each model year, Lucid earns credits for its vehicles, all of which exceed the CAFE standards. Lucid then enters contracts to sell those credits to other vehicle manufacturers.

8.      NHTSA recently issued an interpretive rule setting forth a new interpretation of its authority to set vehicle fuel economy standards under the CAFE program. *See Resetting the Corporate Average Fuel Economy Program*, 90 Fed. Reg. 24,518 (Jun. 11, 2025).

9.      Citing the rule, NHTSA has refused to process end-of-year compliance reports for federal fuel efficiency standards and to issue compliance notifications to manufacturers. In a July 11 letter to vehicle manufacturers, NHTSA indicated that it would stop processing end-of-year reports and issuing compliance notifications until it completes reconsideration of the CAFE standards applicable to Model Years 2022 and later.

10.     NHTSA has not yet processed Lucid's end-of-year reports or issued compliance notifications for Lucid's model year 2022 or later light-duty vehicles.

11.     Lucid suffers harm from NHTSA's non-enforcement of current vehicle fuel efficiency standards. Non-enforcement has reduced the market value for Lucid's compliance credits. The credits represent a significant share of Lucid's revenue.

12.     Lucid also suffers harm from NHTSA's delay in processing compliance reports. Until compliance notifications are processed, Lucid cannot finalize transactions for credits that it has sold to traditional manufacturers in years past.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on August 4, 2025.


Respectfully submitted,

_____
Ashlee Ramanathan